IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

HAMID ADELI                                                                                          PLAINTIFF

v.                                            No. 5:17-cv-05224

SILVERSTAR AUTOMOTIVE, INC.
d/b/a Mercedes-Benz of Northwest Arkansas                                            DEFENDANT

**OPINION AND ORDER**

Before the Court is Defendant Silverstar Automotive, Inc.'s ("Silverstar") motion (Doc. 65) to alter or amend the judgment and brief (Doc. 66) in support. Plaintiff Hamid Adeli ("Adeli") filed a response (Doc. 74), Silverstar filed a reply (Doc. 77), and Adeli filed a surreply (Doc. 81) with leave of Court. Silverstar contends that the punitive damages amount must be reduced because the amount violates its due process rights under the Fourteenth Amendment. Silverstar also seeks a remittitur on the incidental damages amount. For the reasons stated below, Silverstar's motion will be granted in part and denied in part.

**I.     Background**

This case arises from the sale of a used Ferrari F430. The relevant facts leading up to the sale are outlined in the Court's order (Doc. 49) on summary judgment entered on September 13, 2018. The case proceeded to trial and the jury returned a unanimous verdict for Adeli on his claims for breach of contract, fraud, and deceptive trade practices. (Doc. 59). On September 27, 2018, the Court entered judgment in favor of Adeli in the amount of $6,835 in compensatory damages, $13,366 in incidental damages, and $5,800,000 in punitive damages. (Doc. 62). Silverstar filed a post trial motion for judgment as a matter of law[1] and this post trial motion to alter or amend the

---

[1] The Court entered a separate order (Doc. 82) denying the motion for judgment as a matter of law.

1

judgment. Silverstar contends that the punitive damages award is unconstitutionally excessive and should be reduced to $28,000. Silverstar further argues that the incidental damages should be reduced to $1,575.

## II. Analysis

Because Silverstar's punitive damages argument is premised on the appropriate ratio of punitive damages to compensatory damages, the Court's decision on the incidental damages award may impact the Court's analysis on the proper punitive damages amount. The Court will therefore address Silverstar's request for a remittitur as to the incidental damages first and then turn to punitive damages.

### A. Incidental Damages

Silverstar seeks a remittitur on the incidental damages award, arguing the amount of damages the jury awarded lacked evidentiary support and was the result of passion and prejudice. The Court may order a remittitur "when it believes the jury's award is unreasonable on the facts." *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (citation omitted). "A trial court is within its discretion in remitting a verdict only when, after reviewing all the evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias, or prejudice, or is so excessive . . . as to shock the judicial conscience of the court." *Wallace v. FedEx Corp.*, 764 F.3d 571, 593 (6th Cir. 2014); *see also* 11 Charles A. Wright et al., *Federal Practice & Procedure*, § 2815 (3d ed. 2018).

> The Court issued the following instruction for incidental damages:
>
> The elements of incidental damages that Adeli claims are expenses reasonably incurred in the inspection, receipt, transportation of the Ferrari, and any other reasonable expenses incident to the breach of warranty. Whether this element of damages has been proved by the evidence is for you to determine.

(Doc. 74-1, p. 337). The jury returned an incidental damages award of $13,366. The Arkansas

model instruction provides the jury with discretion in deciding what "other reasonable expense[s]" are incident to the breach. AMI Civ. 2521 (2017). Based on the evidence presented at trial, the figure does not appear to be so excessive as to shock the conscience. Nor is the amount so large as to indicate the jury acted with bias or prejudice. Adeli presented a clear, detailed summary of the expenses he incurred in the months after purchasing the car. The instructions properly instructed the jury of the costs which it could consider as incidental, as well as its role in assessing the amount of damages. The incidental damages awarded were not untethered from Adeli's evidence. It is not the Court's task to decide whether the amount of damages returned is correct, but only whether it is reasonable. *See Wallace*, 764 F.3d at 593-94. The incidental damages award will stand.

### B. Punitive Damages

Silverstar next argues that the punitive damages award is unconstitutionally excessive and violates its due process rights. Juries maintain flexibility in determining the amount of punitive damages, but "the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). When analyzing whether a punitive damages award is grossly excessive, "the relevant constitutional line is inherently imprecise." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 434-35 (2001). However, the Supreme Court identified three "guideposts" a reviewing court should focus on: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties that could be imposed in comparable cases. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).

The first guidepost, the degree of reprehensibility of the defendant's conduct, is often considered the most important indicator of the reasonableness of a punitive damages award. *Campbell*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 575). The Supreme Court has directed courts to determine the reprehensibility of a defendant's conduct by considering whether:

> The harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.*

In this case, there was little evidence that this was anything other than an isolated incident and Adeli was not financially vulnerable. The harm Adeli suffered was economic in nature, not physical. But the record undoubtedly reflects the potential for substantial physical harm, and indicates that Silverstar maintained a reckless disregard of the health or safety of others. Joseph Easton, a mechanic at a Washington Ferrari Dealership, concluded the vehicle was not ready for sale because of various safety issues. Easton suggested that these issues should have been disclosed to Adeli given the safety implications. For example, the Ferrari had a cracked exhaust manifold that needed to be repaired because, according to Easton, it could blow the car's motor. Easton also observed that the motor had a fuel leak. On this Ferrari, the exhaust tank was situated approximately three inches from the motor. Given the close proximity of the two, and because the motor was leaking fuel, Easton testified that the cracked exhaust could cause a misfire, or the added head could instantly ignite the leaking fuel and cause the entire car to catch fire.

Easton also testified that the cracked exhaust manifold could permit dangerous gases to leak into the car. The exhaust manifold's primary function is to remove harmful gas created by the engine and to keep the gas from entering the cabin. With the damage to the manifold, harmful gases could enter the car and cause serious health concerns, much like a carbon monoxide leak.

The actual harm assessment here is therefore somewhat misleading. These safety problems created potential physical harms not reflected by the actual damages.

Silverstar argues there is no evidence that the condition of the exhaust actually posed a danger in this case. Rather, the evidence only shows the exhaust could have been an issue. However, Adeli presented evidence of the consequences of a cracked exhaust manifold. It is the jury's duty to weigh the evidence and judge the credibility of the witnesses and their testimony. Based on the evidence Adeli presented, the jury could conclude that the exhaust manifold posed such a danger in this case. The fact that those dangers never materialized into physical harm does not make Silverstar's conduct any less reprehensible. Though the actual harm here was economic, the potential for physical harm was significant.

Silverstar's conduct also demonstrated an indifference to or a reckless disregard of the health or safety of both Adeli and his passengers. Although the Ferrari was owned by Silverstar, Michael Slone, the 22-year-old son of company owner David Slone, drove the car and had unfettered authority to sell the car. Slone organized the car's sale and sent the Ferrari to Boardwalk Ferrari in Texas for a pre-purchase inspection. During the inspection, Boardwalk identified the crack in the exhaust, but Michael Slone affirmatively declined its repair. Larry Neighbors, a Boardwalk employee, discussed each of Boardwalk's recommended repairs with Slone, including the cracked exhaust header. According to Slone, Neighbors merely suggested that the exhaust header was beginning to crack but did not need to be fixed at the time of the inspection. Neighbors denied saying that the header did not need to be repaired. Slone further claimed that he was told the Ferrari was ready for the next buyer, but Neighbors also denied making that representation. There is no disputing that Michael Slone knew of the cracked manifold. With knowledge of the safety defect, the evidence supports the jury's conclusion that Slone sold the Ferrari knowing that

5

it was unsafe to drive.

Silverstar argues that there is no evidence Slone knew of the fuel leak. However, the fuel leak stained the fuel pump ring and insulation, suggesting it had been leaking for at least a few weeks. Easton represented that a simple test drive could have disclosed many of the car's issues, especially the fuel leak. Although it appeared that the car was not thoroughly test-driven before the sale, Slone frequently drove the car on weekends and he was the last one to drive the car immediately before shipping it to Adeli. Though Slone claimed he knew nothing of a gasoline leak, given its opportunity to evaluate Slone's credibility with respect to the other testimony, the jury was not required to accept this testimony as truth. The jury evaluated the evidence, listened to Slone's testimony, and clearly found his testimony not credible. The record supports an inference that Silverstar, and more particularly Slone, knew of the fuel leak or that he recklessly disregarded obvious indicators of the problem. This behavior is particularly reprehensible given the potential dangers to the safety of Adeli and his passengers.

Finally, the evidence demonstrated that Silverstar acted with intentional malice, trickery, or deceit, and this was not merely an accident. Michael Slone had Boardwalk make extensive repairs to the Ferrari but declined the exhaust header repair. His justification for declining the exhaust header repair was directly contradicted by the testimony of Larry Neighbors. Slone later told Adeli that all the repairs had been done even though he knew of the cracked exhaust header. Making an affirmative misrepresentation about a car's condition, especially when the condition gives rise to safety concerns, is often considered one of the more reprehensible acts of business fraud. *Cf. Gore*, 517 U.S. at 579-80 ("[T]he omission of a material fact may be less reprehensible than a deliberate false statement."). After Adeli discovered the defects, he communicated with Josh Guest, General Manager of Mercedes-Benz of Northwest Arkansas. Guest originally

6

suggested to Michael Slone that they should let Adeli return the car, but Michael Slone and David Slone, the majority owner of Mercedes-Benz Northwest Arkansas, overruled him. Silverstar's business practices once the problems were brought to its attention further demonstrate intentional malice, trickery, and deceit and increases the reprehensibility of Silverstar's conduct.

Turning to the second guidepost, the disparity between actual harm and punitive damages, Silverstar argues that a 4-to-1 ratio of punitive to compensatory damages[2] is the standard generally accepted by the Supreme Court as comports with due process. A punitive damages award must bear a reasonable relationship to the actual damages a party suffers. *Gore*, 517 U.S. at 580. But the Supreme Court has refrained from "impos[ing] a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S. at 425; *see also* Gore, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula . . . ."). Although "[s]ingle-digit multipliers are more likely to comport with due process," the facts of a case, specifically the egregiousness of a defendant's conduct, may warrant greater punitive award ratios without rendering those awards unconstitutionally disparate. *Campbell*, 538 U.S. at 425. "[B]ecause there are no rigid benchmarks that a punitive award may not surpass, ratios greater than those . . . previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id.* (quoting *Gore*, 517 U.S. at 582). Silverstar's position is contrary to clearly established Supreme Court precedent.

Silverstar's ratio analysis also relies only on the actual damages Adeli suffered, but the

---

[2] Silverstar also argues the analysis should compare the ratio between the punitive damages and compensatory damages. Though courts frequently use the term "compensatory damages," the Court must consider the actual damages Adeli suffered. *See Campbell*, 538 U.S. at 426 ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."); *see also Gore*, 517 U.S. at 580 (stating that the ratio analysis requires comparison between punitive damages and the "actual harm inflicted on the plaintiff").

7

Court may consider potential harms in addition to actual damages when evaluating whether a ratio is proper. *Campbell*, 538 U.S. at 424-25. As analyzed under the first guidepost, the evidence presented to the jury supports the conclusion that the car was unsafe to drive as a result of the cracked exhaust and fuel leak, and that the physical harm that could have resulted would have been substantial. These potential harms faced by Adeli and his passengers are not measured by the actual damages recovered in this case. The fact that the Ferrari's safety defects never resulted in these harms does not reduce the egregiousness of Silverstar's conduct.

The low compensatory damages award and the high degree of indifference and intentional deception from Silverstar throughout the entire transaction situates this case comfortably among those cases where a higher ratio is justified, but the Court must still ensure the punitive amount comports with Silverstar's constitutional rights. Although Silverstar's ratio analysis ultimately is incorrect, Silverstar is correct that the punitive damages award is too disparate from the actual and potential harm to comport with due process. The jury awarded actual damages of $20,201 and $5.8 million in punitive damages, a 287-to-1 ratio. The jury clearly intended to punish and deter Silverstar from engaging in similar misconduct, and because Silverstar is a prominent Arkansas car dealership, the jury believed the amount had to be high enough to have the desired effect. Nevertheless, a $5.8 million punitive award—an amount that appears to be somewhat arbitrary, rather than tied to any evidence put before the jury—does not bear a reasonable relation to the amount of actual or potential harm in this case.

Turning to the third guidepost, the Court must compare damages that could be imposed in similar civil cases and consider the penalties the legislature has deemed acceptable for this type of misconduct. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate

sanctions for the conduct at issue." *Gore*, 517 U.S. at 583 (internal quotations and citation omitted). The Arkansas Deceptive Trade Practices Act provides for a financial civil penalty of up to $10,000 per violation. Ark. Code Ann. § 4-88-113. Additionally, a person who knowingly and willfully commits an unlawful practice is guilty of a Class A misdemeanor, Ark. Code Ann. § 4-88-103, which is punishable by up to one year in jail and up to a $2,500 fine. Ark. Code Ann. §§ 5-4-401(b)(1), 5-4-201(b)(1). An Arkansas business guilty of unlawful trade practices within the state also risks losing a license, permit, or authorization to do business in the state or forfeiture of a corporate charter. Ark. Code Ann. §4-88-113(b). The loss of a business license or permit is one of the most significant punishments a business can receive, as it would lose its right to engage in its trade. These statutory penalties reveal the Arkansas legislature's intent that fraudulent conduct by Arkansas businesses should result in substantial penalties and support an imposition of substantial punitive damages against Silverstar.

After considering each guidepost, the Court concludes that the jury's award of $5.8 million in punitive damages is unconstitutionally excessive. However, the jury's intention to punish Silverstar and deter future misconduct should be recognized and accepted where, as here, a high punitive damages award is justified. The jury carefully considered the evidence in reaching its decision. This is not a case where a party inflamed the jury into imposing a high punitive award with emotional closing statements. Plaintiff's counsel did not recommend that the jury award millions of dollars in punitive damages. Rather, counsel merely reiterated in closing remarks that punitive damages were necessary to send a message that fraudulent practices in Arkansas will not be tolerated. (Doc. 74-1, p. 364). Having carefully reassessed the evidence and conduct of Silverstar, the Court concludes that a maximum punitive damages award of $500,000 comports with due process.

9

The Eighth Circuit has found a similar ratio of punitive damages to actual damages to be constitutional. *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1027 (8th Cir. 2000).[3] In *Grabinski*, the trial court upheld a jury verdict of punitive damages after a car dealership and its employees misrepresented and concealed serious problems with a car that rendered it unsafe to drive. *Grabinski v. Blue Springs Ford Sales, Inc.*, No. 93-1209-CV-W-6, 1998 WL 755019, at *3-4 (W.D. Mo. Oct. 27, 1998). The court carefully considered each of the *Gore* factors in reaching its decision. The Eighth Circuit concluded that a 27-to-1 collective ratio was justified because, as was the case here, "the defendants' conduct was egregious and . . . demonstrated a clear and disturbing disregard for [the plaintiff's] safety and her economic interests." *Grabinski*, 203 F.3d at 1027. The *Grabinski* ratio is instructive on the constitutional boundaries of a punitive damages award in this type of case. The punitive damages will therefore be reduced to $500,000.

The Court need not offer Adeli the opportunity to reject the lesser amount in favor of a new trial because his consent is irrelevant. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049-50 (8th Cir. 2002). The Court's mandatory duty to reduce an unconstitutional verdict renders a remittitur improper. *Id.*

Postjudgment interest on the amended judgment will run from the date of the original judgment, September 27, 2018. Postjudgment interest begins to run when damages are clearly ascertained. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990). Where an unconstitutional punitive damages award is reduced, the damages are clearly ascertained on the date of the original judgment. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1340 (11th Cir. 1999).

---

[3] The Court disagrees with Silverstar's argument that *Grabinski* is not good law because it was decided pre-*Campbell*. *Campbell* does not overrule *Gore*, it merely amplifies the *Gore* principles. That *Grabinski* was decided before *Campbell* makes it no less instructive in this case.

10

## III. Conclusion

IT IS THEREFORE ORDERED that Silverstar's motion to alter or amend the judgment (Doc. 65) is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent the punitive damages award is reduced from $5,800,000 to $500,000. The motion is otherwise denied. An amended judgment will be entered separately.

IT IS SO ORDERED this 7th day of February, 2019.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE